**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RAYMOND A. HUBERTS,
Plaintiff-Appellant,

v.                                                                              No. 96-1560

THE TRAVELERS INDEMNITY COMPANY,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-95-976-A)

Argued: January 29, 1997

Decided: May 20, 1997

Before HALL and LUTTIG, Circuit Judges, and
BUTZNER, Senior Circuit Judge.

_____

Vacated and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Harlan Lee Weiss, KIVITZ & LIPTZ, L.L.C., Chevy
Chase, Maryland, for Appellant. Edward Hutton Starr, MAYS &
VALENTINE, Alexandria, Virginia, for Appellee. **ON BRIEF:** Brian
R. Greene, KIVITZ & LIPTZ, L.L.C., Chevy Chase, Maryland, for
Appellant. Mary Catherine Zinsner, MAYS & VALENTINE, Alexan-
dria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

In this diversity action to enforce the terms of an insurance contract providing coverage for property loss, Raymond A. Huberts, the insured, appeals the district court's grant of summary judgment to Travelers Indemnity Company. Because a genuine issue of material fact remains to be resolved, we vacate the judgment below and remand the case for trial.

I.

A.

This case concerns a manuscript of a biographical work entitled The Lisa Rohn Case - Revisited. Huberts, a literary novice, began composing the book sometime after he was forcibly returned to the United States from El Salvador in April 1992 to face indictment on two counts of passport fraud. Huberts and Rohn had been partners in a massive credit card scam in the mid-1980s, for which each was eventually imprisoned. The pair had become romantically involved, and two daughters were born of the union.

Shortly following her release from federal confinement in 1991, Rohn murdered her fiance, Roger W. Paulson, who had contacted the authorities upon discovering that Rohn (who had assumed a false identity) was again involved in criminal activity. The case engendered considerable notoriety, becoming fodder for supermarket exposes and a made-for-TV movie.

Huberts completed the manuscript in August 1994, a few months after moving with his daughters into a rented cottage in Boyce, Virginia. He subsequently mailed the manuscript to Janus Publishing Co. in London, England, to be appraised.

2

At about the time that he completed the manuscript, Huberts obtained a renter's policy for the cottage from Fireman's Fund; that policy provided loss coverage for another work (the Furnace manuscript) that he had previously completed and submitted for appraisal. Awaiting the appraisal of the Rohn manuscript, Huberts procured two more renter's policies for the cottage. One was issued by Travelers through AAA Insurance Agency of Orlando, Florida; the other was issued by the United States Automobile Association (USAA).

By letter dated October 21, 1994, Janus informed Huberts that it had appraised the Rohn manuscript at $185,000. Huberts wrote to AAA and USAA, seeking to extend the existing policies to cover the Rohn manuscript. Before writing to USAA, Huberts applied to State Farm for another renter's policy, specifically requesting insurance for the manuscript. AAA, USAA, and State Farm each informed Huberts that it could not provide the coverage that he sought.

Huberts finally insured the manuscript through First Virginia Insurance Services Agency, which, like AAA, is an agent for Travelers. The manuscript was covered pursuant to a renter's policy, the fourth actually issued for the cottage. Huberts stored the manuscript in a small safe in the cottage, along with the floppy computer disks upon which the word processing file was stored.

Travelers issued the policy on December 23, 1994, after Steve Atwell of First Virginia had taken Huberts's application over the telephone. Question No. 10 on the application inquired of the prospective insured whether any insurance had been "declined, cancelled or non-renewed." According to Atwell, Huberts answered that question "No." Huberts, however, steadfastly denies that Atwell ever asked the question.

B.

In the late afternoon of May 5, 1995, at the conclusion of an overnight trip to Washington, D.C., Huberts, his children, and his sister returned to the cottage to discover that it had been ransacked. The perpetrator(s) had cut the telephone line outside the cottage, pried open the rear door, and smashed the computer console for the burglar alarm. The door to the safe stood wide open, and all of its contents

3

-- including the Furnace and Rohn manuscripts, the accompanying computer disks, and miscellaneous notes and audiotapes -- had been removed. Huberts drove to a pay telephone and contacted his alarm service provider, which, in turn, reported the incident to the county sheriff's office.

Huberts told the investigating deputy that he had written the combination to the safe in an address book that he had kept in a drawer of his computer desk. The address book had been taken, but the computer and other items of pecuniary value had not been disturbed. A private detective whom Huberts asked to inspect the crime scene prepared a report, in which he opined that the intruders may have stolen the manuscripts and the other contents of the safe in the hope of destroying information that could clear Rohn of Paulson's murder.

Huberts notified his insurers of the incident a couple of days later. Firemen's Fund paid the full $150,000 appraisal value of the Furnace manuscript. Travelers, however, refused to settle Huberts's claim for the loss of the Rohn manuscript, prompting this action, filed in the district court on July 20, 1995. Travelers filed a counterclaim for rescission, asserting misrepresentation and fraud.

During discovery, Travelers asked the district court to compel Huberts to produce his computer's hard drive so that another copy of the manuscript might be extracted therefrom. Huberts responded that he had not saved the word processing file to the hard drive, and that, in any event, the hard drive and motherboard had been replaced after the computer was struck by lightning during an electrical storm in July 1995.

Each side moved for summary judgment, submitting memoranda and other materials in support of their respective motions. The district court denied Huberts's motion and granted Travelers' cross-motion, ruling that

> [o]n his application for insurance, plaintiff answered in the negative when asked whether he had ever had "any insurance declined, cancelled, or non-renewed." . . . The court concludes that the question . . . is not ambiguous and is obviously material to the risk taken by defendant when it

> issued the policy. <u>Plaintiff's answer to the question was clearly false</u> and was made with knowledge of its falsity.

Op. of March 15, 1996 (emphases supplied). The court subsequently denied Huberts's motion for reconsideration. Huberts appeals.

## II.

### A.

Under Virginia law, an insurer is entitled to rescind an insurance contract if it can clearly prove that the insured has, in applying for coverage, misrepresented a fact material to the risk at the time it was assumed. Va. Code Ann. § 38.2-309 (Michie 1994); <u>St. Paul Fire & Marine Ins. Co. v. Jacobson</u>, 48 F.3d 778, 780 (4th Cir. 1995) (<u>citing</u> <u>Time Ins. Co. v. Bishop</u>, 425 S.E.2d 489, 491 (Va. 1993)); <u>Mutual of Omaha Ins. Co. v. Dingus</u>, 250 S.E.2d 352, 355 (Va. 1979). If a misrepresentation is proved to have been made, its materiality to the risk assumed is a question of law to be determined by the court. <u>Harrell v. North Carolina Mut. Life Ins. Co.</u>, 213 S.E.2d 792, 794 (Va. 1975).

The district court concluded, based on the record before it at summary judgment, that Huberts's failed earlier attempts to procure coverage for the <u>Rohn</u> manuscript would have been material to the risk assumed by Travelers, <u>i.e.</u>, either to its decision to issue the policy in the first instance, or to its determination of the premium to be charged. The court's conclusion finds support in the deposition testimony of E. James Long, Jr., an underwriter for Travelers, who asserted that the company would have declined Huberts's application had it known of the prior rejections.

Travelers' entitlement to rescission, however, depends not only on the materiality of Question No. 10 to its decision to insure the manuscript or to the premium to be charged, but also on the threshold issue of misrepresentation -- whether the question was asked of Huberts, and, if so, whether Huberts answered falsely. The question of whether a misrepresentation was made, if disputed by the insured, is ordinarily one for the jury. <u>United States Fidelity & Guaranty Co. v. Haywood</u>, 177 S.E.2d 530, 532 (Va. 1970). If a jury could reasonably resolve the

5

issue in favor of the insured, summary judgment for the insurer is precluded. Fed. R. Civ. P. 56(c) (summary judgment appropriate only in the absence of a genuine issue of material fact); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party.").

The issue of Huberts's alleged misrepresentation is hotly disputed. Indeed, at his deposition, Huberts flatly denied that Atwell ever asked him Question No. 10. For the purposes of summary judgment, Huberts's testimony must be taken as true. Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). The district court nevertheless "found" (1) that the question was asked, (2) that Huberts answered it "No," and (3) that Huberts's answer was knowingly false.

The bases for these three "findings" are not apparent from the district court's memorandum opinion, but it may have misunderstood Huberts to have conceded the first two points in documents that he submitted to the court. For example, Huberts contended in the memorandum accompanying his own motion for summary judgment that "Travelers made no effort to explain the meaning or intent of the question. . . ." On another occasion, as part of a formal stipulation of facts, Huberts agreed that "Travelers never explained to [him] what `any insurance declined' meant[.]"

To the extent that the district court may have relied on the above contentions (or any of the others that Travelers has identified in its brief) in support of its decision, its reliance was misplaced. As a prelude to the contentions in the memorandum accompanying his motion for summary judgment, it was clearly stated that"Mr. Huberts denies Atwell asked if any insurance had been declined, canceled or non-renewed. However, for the sake of this Motion , Mr. Huberts assumes the truth of Mr. Atwell's representations." Plaintiff's Memorandum of March 1, 1996, at 6 n.4 (emphasis supplied). In light of this unequivocal caveat, it is plain that the subsequent contentions purported to

6

amount to a concession were instead merely an acknowledgment of the potential materiality of the issue in dispute. **1**

We note also that, strictly speaking, none of the contentions advanced by Huberts in support of his motion for summary judgment or elsewhere are necessarily inconsistent with his testimony that Atwell omitted Question No. 10 entirely. For instance, it is manifest that if the question were never asked, then it certainly was never explained.

In light of the record before us, we can only conclude that the district court, in ruling on the motion for summary judgment, resolved a genuinely disputed, material fact in favor of the movant. That, of course, it may not do.**2**

B.

Travelers argues in the alternative that we may affirm the district court's judgment on the ground that Huberts's claim was fraudulent as a matter of law.**3** Though the circumstances surrounding the ransacking of the cottage would appear suspicious to all but the terminally naive -- particularly in view of Huberts's background -- we believe that the question of his claim's veracity is best left for the jury.

_____

**1 See Cram v. Sun Ins. Office Ltd.** , 375 F.2d 670, 673-74 (4th Cir. 1967):

> Neither party, by moving for summary judgment, concedes the truth of the allegations of his adversary other than for purposes of his own motion. A movant may contend that under his theory of the case, no substantial issue of fact exists, while under the adversary's theory factual questions are in issue.

**2** We express no opinion as to the correctness of the district court's conclusion that, if Huberts answered Question No. 10 in the negative, that answer was, as a matter of law, knowingly false.

**3** We do not understand Travelers, by arguing in the alternative, to have conceded that the district court's rationale in support of its grant of summary judgment was incorrect.

III.

The judgment below is vacated, and the case is remanded for trial.**4**

<u>VACATED AND REMANDED</u>

_____

**4** Our disposition of the case on the ground that the district court improperly resolved a genuine issue of material fact in favor of Travelers renders it unnecessary to address the other arguments that Huberts has advanced in support of his position.

8