**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 03-1259**

_____

TIG INSURANCE COMPANY,

Plaintiff - Appellee,

versus

ROBERTSON, CECIL, KING & PRUITT, a limited
partnership; ROBERTSON, CECIL, KING & PRUITT,
LLP; DAVID E. CECIL; THOMAS L. PRUITT;
INTREPID COAL COMPANY, INCORPORATED,

Defendants - Appellants,

and

F. D. ROBERTSON; PATRICIA B. ROWE; JAMES C.
BRANHAM; JANET M. MCMAHON; DONALD KEITH
MCCLANAHAN,

Defendants.

_____

Appeal from the United States District Court for the Western
District of Virginia, at Abingdon. James P. Jones, District Judge.
(CA-01-143-1)

_____

Argued: October 27, 2004          Decided: November 17, 2004

_____

Before MOTZ and TRAXLER, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

**ARGUED:** Monica Taylor Monday, GENTRY LOCKE RAKES & MOORE, Roanoke, Virginia, for Appellants.  Carol L. Johnson, BOLLINGER, RUBERRY & GARVEY, Chicago, Illinois, for Appellee.  **ON BRIEF:** S. D. Roberts Moore, Mary Beth Nash, GENTRY LOCKE RAKES & MOORE, Roanoke, Virginia; T. Shea Cook, Richlands, Virginia, for Appellants.  Bryan G. Schumann, Michael G. Patrizio, BOLLINGER, RUBERRY & GARVEY, Chicago, Illinois, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

In this diversity insurance coverage dispute, the district court granted summary judgment to the insurance company. For the reasons set forth within, we affirm.

## I.

On April 5, 1999, Ronald King, on behalf of Robertson, Cecil, King & Pruitt ("the Firm"), signed a renewal application for professional liability insurance through TIG Insurance Co. ("TIG"). As part of that application, King was asked:

> Is any attorney in your firm aware of any claims made (whether reported or unreported), incidents (whether reported or unreported), wrongful acts, errors, or omissions that could result in a professional liability claim against any past or present attorney of the firm or its predecessors or is there a reasonable basis to foresee that a claim would be made against any past or present attorney or the firm or its predecessors?

King responded that there had been "no change," which based on the Firm's past applications translated into "no." On April 21, 1999, TIG reissued the insurance policy.

On June 21, 1999, King died from a self-inflicted gunshot wound. Soon thereafter, the Firm discovered that King had misappropriated client funds. Based on this conduct, a number of persons filed suit against the Firm, its successor, the partners of the Firm as individuals, and King's estate (collectively the "Partnership").

3

The Partnership then requested defense and indemnification from TIG.[1]  In response, TIG filed the instant action, seeking (1) rescission of the policy based on a misrepresentation in the application, or (2) a declaration that the claims were not covered by the policy based on that same misrepresentation, or (3) a declaration that the "Compton claim" in particular was not covered because King's conduct fell within an exclusion in the policy.  The Partnership counterclaimed for breach of contract.  The parties filed cross-motions for summary judgment, and the district court granted summary judgment to TIG, finding the insurer entitled to rescind the policy, which left the Partnership without coverage.

II.

Under Virginia law, which applies here, an insurance company is entitled to rescind an insurance policy if it can show "by clear proof" that (1) a statement in the application was untrue and (2) "the insurance company's reliance on the false statements was material to the company's decision to undertake the risk and issue the policy."  See Va. Code Ann. § 38.2-309; Comm. Underwriters Ins.

---

[1]  All of the claims against the Partnership at issue in this case -- "Compton," "McClanahan," and "Intrepid Coal" -- are premised on allegations that King misappropriated client funds.  In the "Compton" case, the district court has entered judgment against the Partnership.  In the "McClanahan" case, judgment was entered against King's estate, and the case against the other parties settled.  Finally, at the time of briefing the case at hand, the "Intrepid Coal" case was pending in state court.

4

<u>Co. v. Hunt & Calderone</u>, 261 Va. 38, 42 (2001).  The Partnership argues that TIG was not entitled to rescission because: (1) TIG did not prove the required elements for rescission, (2) the policy provided for "cancellation" as the remedy for misrepresentations, and (3) allowing rescission in this case, in which the Partnership contracted for "innocent partner" protection, would eviscerate the "clear intent of the policy."  None of these contentions has merit.

A.

The Partnership's initial contention -- that TIG is not entitled to rescission because it failed to prove the required elements for rescission -- is belied by the record.

The Partnership makes two arguments with respect to the first required element of "untruthfulness."  First, it argues that the response to the application question was not "untrue" because at the time King signed the application no clients had notified him of their dissatisfaction.[2]  Client notification, however, is not required under the plain language of the policy which requests information on "<u>any</u> claims . . . wrongful acts, errors, or omissions that <u>could</u> result in a professional liability claim."

Next, the Partnership argues that the statements were not "untrue" because King could have converted the funds during the two-month period between signing the application and King's death.

---

[2]  Of course, his clients did not "notify" King of their dissatisfaction only because he had deftly kept them in the dark with respect to his fraudulent behavior.

5

The Partnership offers no affirmative support for this statement, and ignores the strong record evidence to the contrary.[3]  Indeed, during oral argument, the district court expressly asked whether King engaged in "wrongful activities" prior to signing the 1999 renewal application, and the Partnership agreed that it did not dispute that he had.  Because it is evident from the record that King had already converted client funds prior to signing the 1999 application, his assertions in that application were patently untrue, satisfying the first rescission requirement.

Nor do we find any more persuasive the Partnership's argument with respect to the other rescission requirement -- that TIG assertedly failed to demonstrate that the misrepresentations were material.  To prove that a fact is material to the risk, an insurer must demonstrate that it would influence its decision to issue the policy.  Mutual of Omaha Ins. Co. v. Echols, 207 Va. 949, 953-54 (1967).  A court will not take "judicial notice" of this fact, see Harrell v. North Carolina Mutual Life Ins. Co., 215 Va. 829, 833 (1975) (discussing predecessor statute), nor will boilerplate language in the policy asserting the materiality of all representations suffice.  Comm. Underwriters, 261 Va. at 43.  But an underwriter's sworn statements, particularly when

---

[3]  In particular, the record reveals that King converted funds from Compton when he took possession of a check in 1996; that he pilfered funds from the McClanahan estate from 1993 to 1997;  and that he assertedly misappropriated funds from Intrepid Coal Corp. in 1998.

6

uncontradicted, are sufficient to demonstrate the materiality of the misrepresentation. Echols, 207 Va. at 954-55; Hawkeye-Security Ins. Co. v. Gov't Employee Ins. Co., 207 Va. 944, 948 (1967).

In this case, TIG submitted an affidavit from a TIG underwriter, which specifically averred that a policy would not have been issued if King had disclosed his misconduct. The Partnership offered no evidence to the contrary, and conceded during the motions hearing that the information might indeed "be material." As the district court noted, it would be "unimaginable that the facts of King's misconduct would not be material to the risk of insuring against future malpractice claims."

Thus, TIG proved the required elements of recission.

B.

The Partnership next contends that even if TIG technically satisfied the rescission elements, TIG waived its right to rescission by mentioning "cancellation" as a remedy for misrepresentations in the policy. This argument too fails.

Cancellation and rescission are different and alternative remedies. By "rescinding" the policy, the contract is voided ab initio, alleviating TIG's responsibility for any claims arising during the policy and requiring it to return the premiums paid. If TIG instead chose to "cancel" the contract as provided for in the policy, TIG would still be responsible for defending against prior claims, because relief would be prospective only.

7

The Partnership has failed to cite any authority for the novel proposition that providing for "cancellation" in an insurance policy necessarily precludes the alternative remedy of rescission, and there is no reason why it should. Although an insured could contract for "greater protection," including a limitation of remedies, the Partnership did not do so here. See Atlantic Permanent Fed. Savings & Loan Assoc. v. Amer. Casualty Co., 839 F.2d 212, 215 (4th Cir. 1988) (enforcing policy language, under Virginia law, which stated that the policy "shall not be voided or rescinded"); see also Sterling Ins. Co. v. Willie Roy Dansey, 195 Va. 933, 943 (1954) (enforcing language in application requiring answers to be "knowingly" false). In this case, the policy allowed either party to cancel, and specifically stated that the insurer "may" cancel the policy for several reasons, only one of which was because of a "misrepresentation in the Application." Thus, although under the policy TIG "may" choose cancellation over rescission, it is by no means required to do so.

C.

Finally, the Partnership contends that allowing rescission would violate the "clear intent of the policy" because it would allow TIG to eviscerate the "innocent partner" protection provided in the policy. This argument rests on a misunderstanding of the scope of the policy's "innocent partner" protection.

8

Even if, as Cecil and Pruitt vigorously contend, they did not know of King's misrepresentation on the application, they were not "innocent partners" for the purpose of the insurance policy. The only protection for "innocent parties" provided in the policy is Exclusion 1, and is limited to protection from judgments "arising out of any dishonest, fraudulent, criminal, malicious or knowingly wrongful act, error, omission, or Personal Injury." The Partnership could have, but did not, contract for additional protection in the case of a partner making misrepresentations on behalf of the partnership on the application form. Cf. Atlantic, 839 F.2d at 215 (noting policy language stating that the policy "shall not be voided or rescinded and coverage shall not be excluded as a result of any untrue statement in the [application] form, except as to those persons making such statement or having knowledge of its untruth"). Thus, although Cecil and Pruitt may, in fact, be "innocent," they did not contract to be protected in this circumstance, and as a result, rescission of the policy does not violate the "clear intent of the policy."

### III.

For all of these reasons, the judgment of the district court is

AFFIRMED.

9